**PLOUGH INCORPORATED, et al., Appellants,**

v.

**NATIONAL ACADEMY OF SCIENCES, et al., Appellees.**

**No. 86–812.**

District of Columbia Court of Appeals.

Argued July 8, 1987.

Decided Sept. 9, 1987.

al which had not been admitted in evidence.

Bryan Jay Yolles, with whom Katherine D. McManus, Washington, D.C., was on the brief, for appellants.

Calvin H. Cobb, Jr., with whom Joseph P. Esposito, Audrey Byrd Mosley, and James R. Wright, Washington, D.C., were on the brief, for appellees.

Before MACK, NEWMAN and BELSON, Associate Judges.

NEWMAN, Associate Judge:

Plough, Inc. seeks to set aside an order of the Superior Court dated April 18, 1986, granting to the National Academy of Sciences a protective order permitting it to withhold from discovery certain documents subpoenaed by Plough. We affirm.

I

Plough, Inc., a manufacturer of pharmaceutical products, is a defendant in *Bunch v. Dow Chemical Co.*, Case No. 82564 (Cal. Super.Ct., Butte County), a products liability action in which plaintiff alleges that aspirin made by Plough and Plough's co-defendants caused him to develop Reye Syndrome. Plaintiffs in that action became aware that the Public Health Service of the United States Department of Health and Human Services (hereinafter PHS), in conjunction with Westat, Inc., a private contractor, had conducted a Pilot Study of the association between aspirin and Reye Syndrome. PHS also retained appellee National Academy of Sciences (hereinafter NAS) to review and critique the PHS–Westat Pilot Study.[1] The Pilot Study found that a strong association exists between the use of aspirin and Reye Syndrome. A Committee of NAS scientists issued five Reports on the Pilot Study, concluding that the Study was methodologically sound and its findings scientifically valid. The NAS Committee also recommended that in order to protect the public health, results of the Pilot Study should be promptly released to the public through the appropriate scientific channels, even though a nationwide government study on Reye Syndrome had yet to be conducted. The Pilot Study was subsequently published in the New England Journal of Medicine.[2]

During discovery in the *Bunch* case, Plough issued a subpoena for the deposition of NAS's custodian of records and for the production of NAS documents relating to its review of the Pilot Study. NAS provided the five final Reports and most of the other documents requested, but sought a protective order under Super.Ct.Civ.R. 26(c) as to the following classes of documents: (1) those reflecting the Committee's confidential deliberations in closed session concerning its review of the methodology of the Pilot Study; (2) preliminary drafts of the Committee's Reports, and (3) documents reflecting NAS's confidential internal review of the Committee Reports.[3] Plough, joined by nine of its co-defendant pharmaceutical manufacturers in the *Bunch* case, opposed the motion for a protective order.

The matter came before Judge Graae on February 24, 1986. Among its motion papers, NAS had filed a letter from counsel for plaintiffs in the *Bunch* case stating that he did not anticipate introducing the NAS Reports into evidence in his case-in-chief, but could make no representations as to their potential use in rebuttal. The court concluded, based on this letter, that since the NAS reports might be entered in evidence by *Bunch* plaintiffs at trial, Plough had made a showing of relevance

1. Created by act of Congress, 36 U.S.C. § 251 *et seq.* (1982), NAS is a private, nongovernmental, nonprofit corporation. It is frequently called upon by executive agencies and Congress to conduct studies and investigations on subjects relating to science or art. "The studies are conducted by specifically-convened committees composed of leading scientists and experts who volunteer their time to perform studies and prepare reports." Brief of Appellee at 5.

2. *Public Health Service Study On Reye Syndrome And Medications, Report Of The Pilot Phase,* 313 NEW ENG. J. MED. 849 (1985).

3. Every final Report issued by NAS is the product of two committees: the authoring Committee and a review committee. "The [authoring] committee deliberations involve a continuing review of relevant information and revisions of draft reports until a consensus is reached and a final draft is prepared. Once the draft report is completed, it undergoes a vigorous internal review within the Academy, a review conducted by other volunteer scientists whose comments—but not identities—are given to the [authoring] committee." Brief Of Appellee at 5.

outweighing NAS's need for confidentiality. The judge denied NAS's motion for a blanket protective order, directing it to produce the requested documents subject to a protective order to be negotiated by the parties.

NAS filed a Motion For Reconsideration, producing a second letter addressed to NAS's attorney, dated March 5, 1986, from counsel for the *Bunch* plaintiffs. This letter stated that counsel had read the five NAS Reports and had "no intention of relying on these reports at trial for any purpose." In an order dated April 18, 1986, the trial court vacated its original order, and entered a superseding order granting NAS blanket protection from discovery of the confidential documents. The reconsideration was based in part upon the second letter written by counsel for *Bunch* plaintiffs. The court explained that Plough had claimed a need for the requested documents in order to evaluate and rebut the NAS Committee's conclusions endorsing the validity of the Pilot Study. That claim of need was predicated on the assumption that the *Bunch* plaintiffs would use the NAS Reports at trial to bolster the credibility and prestige of the Pilot Study. However, that assumption, reasoned the court, was now undermined by *Bunch* counsel's representation that plaintiffs did not intend to use the NAS Reports at trial for any purpose.

The court had also altered its view of NAS's arguments in favor of confidentiality. It was now persuaded that the same policy considerations underlying the qualified privilege afforded medical peer review committees [4]—that of ensuring candid, unfettered professional criticism—applied in this case as well, and that NAS's internal deliberations were entitled to protection from disclosure absent "compelling or extraordinary need." The court concluded that Plough's need for the documents did not override NAS's right to confidentiality, and that its previous ruling ordering disclosure had been erroneous. It therefore granted NAS's request for a protective order as to the materials in dispute.

## II

Super.Ct.Civ.R. 26(c), under which NAS seeks protection against discovery of the requested documents, provides in relevant part:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, this Court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including 1 or more of the following: ... (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way....

The legal principles which govern a trial court's consideration of a motion for a protective order under Rule 26(c) are well established by federal court decisions.[5] The person resisting discovery on the basis of confidentiality must first demonstrate that disclosure might be harmful. *Centurion Industries v. Warren Steurer & Assoc.*, 665 F.2d 323, 325 (10th Cir.1981); 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2043, at 301 (1970). The burden then shifts to the party seeking discovery to establish that the disclosure is both relevant and necessary to the action. *Id.* at 301–02; *Centurion, supra,* 665 F.2d at 325; *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 107 F.R.D. 288, 292 (D.Del.1985); *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 559 (7th Cir.1984); *Ross v. Bolton*, 106 F.R.D. 22, 24 (S.D.N.Y.1985). "[T]he governing relevance standard that the movant must satisfy is the broad rele-

---

4. *See Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970), *aff'd,* 156 U.S.App.D.C. 199, 479 F.2d 920 (1973); *Mewborn v. Heckler*, 101 F.R.D. 691 (D.D.C.1984); D.C.Code § 32–505 (1981).

5. Super.Ct.Civ.R. 26(c) is identical to its federal counterpart. "In interpreting the applicable dis-

covery rules, we are guided generally by decisions construing the Federal Rules of Civil Procedure, which are substantially the same as the rules of the trial court." *Dunn v. Evening Star Newspaper Co.*, 232 A.2d 293, 295 (D.C.1967) (citation omitted).

vance standard applicable to pre-trial discovery, i.e., the movant must show that the material sought is relevant to the subject matter of the lawsuit." *Coca-Cola, supra,* 107 F.R.D. at 293. A showing of relevance does not require that the material be admissible at trial, C. WRIGHT & A. MILLER, *supra,* § 2043 at 304; Super.Ct.Civ.R. 26(b)(1); it need only "appear[ ] reasonably calculated to lead to the discovery of admissible evidence." *Id.* To show necessity, the party seeking discovery must demonstrate that the information is necessary to the preparation of its case for trial, including proving its own theories and rebutting those of its opponent. *Coca-Cola, supra,* 107 F.R.D. at 293.

■ If both parties have met their respective burdens, the trial court must balance the need for the information against the injury that would result from disclosure. *Deitchman, supra,* 740 F.2d at 559; *Centurion, supra,* 665 F.2d at 325; *Coca-Cola, supra,* 107 F.R.D. at 293; *Richards of Rockford, Inc. v. Pacific Gas & Electric Co.,* 71 F.R.D. 388, 389 (N.D.Cal.1976); C. WRIGHT & A. MILLER, *supra,* § 2043 at 301–02. There are no bright-line rules to guide the trial court in this balancing process; the determination as to whether or not discovery will be granted is left to the sound discretion of the trial court, and "will not be disturbed on appeal unless there has been an abuse of discretion...." *Haynes v. District of Columbia,* 503 A.2d 1219, 1224 (D.C.1986); *see generally Johnson v. United States,* 398 A.2d 354, 361–67 (D.C.1979).

## II(A)

### *NAS's need for confidentiality*

■ To repeat, the documents requested by Plough and withheld by NAS are (1) those reflecting the closed deliberations of the NAS Committee concerning its review of the Pilot Study's methodology, (2) preliminary drafts of Committee reports, and (3) documents reflecting the confidential internal deliberations of the separate NAS committee chosen to review the Report of the authoring Committee. NAS contends that confidentiality is necessary to preserve the candid exchange of views by the authoring Committee and frank commentary by the reviewers. As background to an understanding of why this is so, NAS describes its operating procedure as follows.

When NAS is requested to do a study, it convenes a Committee, composed of prominent scientists and engineers in the relevant field of study, who volunteer their services to conduct a study and prepare a report. The Committee reviews the relevant data, and undertakes an extended series of deliberations involving candid exchanges of views by the Committee members in closed session. Based upon these deliberations, draft reports are prepared and revised until agreement is reached by the members of the Committee. The reports are then submitted to a review panel composed of members other than those on the authoring Committee. Reviewers are warned not to discuss drafts publicly and are assured that the deliberations of the review panel are confidential. Critical comments of the reviewers are then provided to the authoring Committee, with the names of the individual reviewers removed.

Through the affidavits of two of its officers, NAS has presented unrebutted evidence of the destructive effect which disclosure of its deliberative processes would have on the institution. "Participants in Academy studies would be inhibited in expressing their views concerning controversial topics under consideration and reviewers would be hesitant to express their candid opinions regarding draft reports if they knew their comments would subject them to a defense of those comments at a later date in an unrelated matter." Affidavit of Bryce L. Crawford, Jr., Chairman of the Report Review Committee of the NAS, accompanying NAS's Motion for Reconsideration, at 4. Not only would the threat of even limited disclosure disrupt the necessary give-and-take between committee members, but disclosure of critical review comments and their authors would disrupt many working relationships. Further, NAS claims it is likely that the Academy's ability to convince volunteers to serve on its committees would be impaired, since

individuals would be reluctant to serve if they knew their comments were subject to disclosure.

Federal courts interpreting the discovery rules have frequently denied or limited discovery absent claims of formal privilege, based upon reasons of public policy. 4 J. MOORE, J. LUCAS & G. GROTHEER, MOORE'S FEDERAL PRACTICE, ¶ 26.60[3] (2d ed. 1986). NAS's claim for nondisclosure finds support in two lines of these cases. In the first, the courts, in order to prevent a chilling of the uninhibited conduct of academic and scientific research, have recognized an interest in protecting from discovery the analyses, opinions and conclusions drawn by researchers from their data. For example, in *Dow Chemical Co. v. Allen*, 672 F.2d 1262 (7th Cir.1982), university students conducting research into the harmful effects of pesticides were served with an administrative subpoena by the Dow Chemical Co., which was preparing for a hearing before the Environmental Protection Agency. The subpoenas requested not only raw data but "virtually every scrap of paper" produced during the studies. The court refused to enforce the subpoena, noting that

> enforcement of the subpoenas would leave the researchers with the knowledge throughout continuation of their studies that the fruits of their labors had been appropriated by and were being scrutinized by a not-unbiased third party whose interests were arguably antithetical to theirs. It is not difficult to imagine that the realization might well be both unnerving and discouraging. Indeed, it is probably fair to say that the character and extent of intervention would be such that, regardless of its purpose, it would "inevitably tend[ ] to check the ardor and fearlessness of

scholars, qualities at once so fragile and so indispensable for fruitful academic labor." ... In addition, the researchers could reasonably fear that additional demands for disclosure would be made in the future.

*Id.* at 1276 (citation omitted).

Although the *Allen* court was concerned with an administrative subpoena, its reasoning applies with equal force in the context of a Rule 26(c) motion for a protective order.[6] Thus, when E.R. Squibb & Sons, defendant in a products liability litigation, sought discovery of an ongoing University of Chicago study of cancer of the genital tract, the court, relying on *Allen*, denied discovery of "any material reflecting development of [the researcher's] ideas or stating his or others' conclusions not yet published." *Deitchman, supra,* 740 F.2d at 565. As to the raw data of the study, the case was remanded to the trial court to fashion a protective order. *Id.* at 565–66. *See also Ross, supra,* 106 F.R.D. at 24 (material representing staff analyses of data in quasi-governmental agency's investigation into illegal securities trading protected from discovery).

These cases constitute support for NAS's argument that disclosure would seriously damage the ability of its committees to conduct their studies in an uninhibited manner. Plough seeks to distinguish *Allen, supra,* and presumably also *Deitchman, supra,* on the basis that those cases concerned ongoing research, while the NAS studies relating to the Pilot Study have been completed. Although premature disclosure of ongoing research may be the most severe form of "chill" on scientific research,[7] it is not the only form. Even limited disclosure of the preliminary conclusions, hypotheses, thoughts and ideas ventured by Committee members prior to their

---

6. The inquiry in the two contexts is similar, requiring in either case a balancing of the need for the material on the one hand against the burden imposed on the other. *Compare Dow, supra,* 672 F.2d at 1270, *with Deitchman, supra,* 740 F.2d at 559. *See Andrews v. Eli Lilly & Co.,* 97 F.R.D. 494, 503 n. 28 (N.D.Ill.1983), *rev'd on other grounds sub nom. Deitchman, supra.*

7. "Disclosure of information from ongoing epidemiological research can seriously undermine the study since premature disclosure of information, before valid conclusions can be reached by the researchers, may suggest faulty conclusions. These in turn may improperly discredit the study.... Any forced premature disclosure could subject the researchers to professional ridicule and criticism." *Andrews, supra* note 6, 97 F.R.D. at 502–03.

being tested and criticized would not only embarass those members, it would discourage members of NAS committees in the future from expressing themselves freely during their deliberations, and might cause some potential volunteers to refrain from participating in NAS studies altogether.

NAS's arguments in favor of confidentiality, specifically as they relate to the internal *review* panels, are supported by the rationale of a second line of cases interpreting the discovery rules. Those cases have extended a "qualified privilege" to protect the deliberations of internal institutional bodies like NAS's review panels, whose function is to review and criticize the quality of the institution's work. Such a "qualified privilege" has been extended, for example, to hospital staff committees charged with reviewing the clinical work done at the hospital. Materials reflecting the deliberations of such committees have been protected from discovery absent a showing of extraordinary necessity. *Mewborn, supra* note 4, 101 F.R.D. at 693; *Bredice, supra* note 4, 50 F.R.D. 251.[8] An analogous "qualified privilege" has been extended in Title VII litigation to affirmative action compliance reports which certain employers are required to file with the Equal Employment Opportunity Commission and which contain subjective "self-critical analysis" of the employer's affirmative action policies. *See Penk v. Oregon State Bd. of Higher Education,* 99 F.R.D. 506, 507 (D.Or.1982); *Webb v. Westinghouse Electric Corp.,* 81 F.R.D. 431, 433 (E.D.Pa. 1978); *Banks v. Lockheed-Georgia Co.,* 53 F.R.D. 283, 285 (N.D.Ga.1971).[9]

The concern expressed in these cases for unimpeded criticism and self-analysis supports confidentiality of the deliberations of the NAS review panels. The review process is a critical element in the publication of an Academy report, guaranteeing that each report is technically sound, and that it creditably represents the institution. Reviewers provide their comments with the understanding that they will remain internal to the NAS, and that their names will not be disclosed to the authoring Committee. Criticism would be less than frank if subject to disclosure outside the institution, even limited disclosure under a protective order.

## II(B)

### *Relevance and necessity of the documents to Plough's case*

■ To rebut NAS's showing of the potential harm of disclosure, Plough must demonstrate that the materials which it seeks to discover are relevant and necessary to the California action. Plough contends that the documents requested from NAS are plainly relevant to the central issue in the *Bunch* case. The Pilot Study itself is obviously relevant, since it has a "tendency to make the existence of [a] fact that is of consequence to the determination of the action,"—the causal connection between the use of aspirin and Reye Syndrome—"more probable ... than it would be without the evidence." FED.R.EVID. 401. The NAS Reports, having found the Pilot Study to be scientifically valid, are relevant in that they tend to establish the Study and its conclusions as reliable authority.

In its brief, Plough asserts that it must have access to documents reflecting the internal deliberations of the NAS authoring Committee and review panel, because "only

---

**8.** The "qualified privilege" established by *Bredice* has since been codified in D.C.Code § 32–505 (1981), which provides that minutes and reports of such staff committees are not subject to discovery absent a showing of "extraordinary necessity."

**9.** Courts have shown a willingness to extend the "qualified privilege" accorded self-evaluative deliberations to other areas. *See, e.g., Keyes v. Lenoir Rhyne College,* 552 F.2d 579 (4th Cir.) (confidential faculty evaluation records), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d

190 (1977); *Lloyd v. Cessna Aircraft Co.,* 74 F.R.D. 518 (E.D.Tenn.1977) (deliberations of manufacturer's confidential internal review of product quality); *In re Petition of Illinois Judicial Inquiry Bd.,* 128 Ill.App.3d 798, 471 N.E.2d 601 (1984) (bar association's records relating to evaluation of judges); *see also Wright v. Patrolmen's Benevolent Ass'n,* 72 F.R.D. 161 (S.D.N.Y. 1976) (bar association's investigation into transfer of judge; held discoverable despite "self-evaluative function" privilege, since only factual materials, not deliberations, were requested).

by analyzing how the Academy reached its conclusions can Plough hope to rebut the presumption of validity that the Academy has bestowed upon the Pilot Study." It argues that such a need exists whether or not the *Bunch* plaintiffs enter the NAS Reports in evidence at trial. The NAS Reports have been widely publicized, were mentioned in the published version of the Pilot Study in the New England Journal of Medicine, were relied upon by the U.S. Government in deciding to require aspirin products to bear a Reye Syndrome warning label, and will have been reviewed by any person who purports to be an expert on this issue. Therefore, even were plaintiffs to enter into a binding agreement not to introduce the Reports, contends Plough, the Reports will undoubtedly be mentioned by plaintiff's experts at trial, and will need to be rebutted.

■ Plough is correct that the requested materials are relevant by the standard of Super.Ct.Civ.R. 26(b)(1). "A court must 'interpret "relevant" very broadly to mean matter that is relevant to anything that is or may become an issue in the litigation.'" *Dunn, supra* note 5, 232 A.2d at 295 (citation omitted). The NAS Reports bear on the credibility and reliability of a scientific study which relates directly to the central claim of the plaintiffs in *Bunch*. The trial court erred in finding that *Bunch* counsel's expressed intention not to rely on the NAS Reports at trial, "to which plaintiffs are now bound, robs Plough of any legitimate

claim of relevance." Even if plaintiffs do not seek to enter the NAS Reports in evidence,[10] their experts may refer to them as bases for their opinions,[11] or they may be used for impeachment purposes. At any event, in determining relevance for discovery purposes, "[i]t is not ground for objection that the information sought will be inadmissible at the trial...." Super.Ct. Civ.A. 26(b)(1). Contrary to the trial court's view, the documents sought were relevant.

Although Plough has shown relevance, the weakness in its case for discovery lies in its claim of necessity. It must be emphasized that Plough has obtained access to the raw data from the Pilot Study. This is not a case in which a party risks being presented at trial with a study which it can not challenge for lack of data. *See Deitchman, supra*, 740 F.2d at 561 (denial of access to data of scientific study would effectively preclude defendant drug manufacturer from engaging in any meaningful cross-examination of plaintiff's experts' opinions which are based on the study). Plough's concern is with rebutting an *evaluation* of a scientific study. But to do this, it may use means other than securing the requested documents and attacking the deliberative process by which NAS reached its evaluation; it can instead secure its own experts to evaluate the Pilot Study. If they find the Study to be methodologically flawed, plaintiffs' experts relying on the

**10.** Plough is, of course, correct that the District of Columbia Superior Court has no power to bind the *Bunch* plaintiffs to any representations made by their counsel to NAS's attorney. NAS asserts that plaintiffs are estopped by their statements entered in evidence in the trial court below, citing *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1177–79 (D.S.C.1974) and similar cases. *Duplan* concerns the doctrine of judicial estoppel, or "preclusion by inconsistent positions," by which a party may be precluded by a prior position taken in litigation from later adopting an inconsistent position in the course of a judicial proceeding. 1B *Moore's Federal Practice, supra,* ¶ 0.405[8].

However, the dimensions of this doctrine vary from state to state—for instance, it has as yet enjoyed "no vitality" at all in the District of Columbia, *Konstantinidis v. Chen*, 200 U.S.App. D.C. 69, 74, 626 F.2d 933, 938 (1980)—and it is far from certain that the California court would

invoke it to exclude evidence of NAS's Reports were they offered by the *Bunch* plaintiffs. For one thing, judicial estoppel generally applies only when the prior position was made to a court in a prior proceeding. *Id.* at 74–75, 626 F.2d at 938–39. Here, *Bunch* counsel's representation was made not to a court, but to an attorney for NAS, a stranger to the California litigation. Second, the doctrine is not applied when the inconsistent prior position was merely unadvised or the product of honest error, 1B MOORE's FEDERAL PRACTICE, *supra*, ¶ 0.405[8] at 243, which may or may not be the case here.

**11.** WEST's ANN.CAL.EVID.CODE §§ 801(b), 802. *See Williams v. Volkswagen Aktiengesellschaft*, 180 Cal.App.3d 1244, 1260, 226 Cal.Rptr. 306, 314 (1986); *Luque v. McLean*, 8 Cal.App.3d 136, 104 Cal.Rptr. 443, 451–52, 501 P.2d 1163, 1171–72 (1972) (en banc).

Pilot Study may be confronted with these findings. There is no lack of cases holding that "[w]here a [party] is furnished with the raw factual data in a civil case, no prejudice can result to the [party] who can have his or her own experts assess that factual information." *Mewborn, supra* note 4, 101 F.R.D. at 693 (hospital peer review committee); *see also Deitchman, supra,* 740 F.2d at 565 (scientific study by non-party; defendant permitted discovery of factual material only, not material reflecting researcher's ideas or stating his yet unpublished conclusions); *Ross, supra,* 106 F.R.D. at 24 (investigative study by quasi-governmental agency; defendant permitted discovery of factual data, but not of staff analyses of data); *cf. Penk, supra,* 99 F.R.D. at 507 (employment discrimination suit; defendant employer must disclose statistical portions of affirmative action compliance report, but not portions containing subjective self-critical analyses); *Webb, supra,* 81 F.R.D. at 434 (same); *Banks, supra,* 53 F.R.D. at 285 (same).

Plough argues that this suggestion misses the point that NAS's review carries great weight in the scientific community. To paraphrase Plough's argument, even if Plough's experts find flaws in the Pilot Study, the probable response of an opposing witness confronted with those flaws would be to say that the NAS found the Study valid despite the flaws, and the NAS must be right. Presumably, a scientific expert would be more intellectually scrupulous than to attempt to sidestep a methodological flaw by merely invoking NAS's name. At any event, Plough is, at bottom, grounding its claim of the necessity of these documents on its desire to rebut NAS's prestige. Although this might be tactically desirable to Plough, it is an attenuated kind of "necessity", if that term may be applied at all.

## II(C)

### The balance

 NAS has demonstrated a strong interest in the confidentiality of the requested materials. Plough's asserted need for this information is attenuated by the fact that its primary objective at trial, if the Pilot Study is introduced, will be to rebut the conclusions of the Pilot Study, and only secondarily to rebut NAS's evaluation of that Study. Moreover, it can accomplish both by having its own experts testify concerning their own evaluation of the Pilot Study, assuming their opinions conflict with that of NAS. When we further take into account the non-party status of NAS, *see Allen, supra,* 672 F.2d at 1277; *Richards of Rockford, supra,* 71 F.R.D. at 390, we are persuaded that the balance of need against burden favors non-disclosure in this case.

A protective order limiting discovery to litigation purposes would reduce the chilling effects of disclosure, but not eliminate them. In a case in which a higher level of need were shown, disclosure under such an order might be appropriate. Here, however, blanket protection is an appropriate remedy considering the balance of factors.

 Plough contends that we must reverse and remand for a new determination based on the standards we enunciate today. It asserts that in addition to the trial court's error in finding a lack of relevance of and need for the information sought to be discovered, the court fatally erred by imposing upon Plough an "extraordinary necessity" standard.[12] The trial court's order is unclear as to whether or not it actually used that standard. However, assuming, without deciding, that the court erroneously held Plough to an "extraordinary necessity" standard, and despite our conclusion that the trial court, in considering Plough's showing of relevance and need, erred in giving exaggerated weight to *Bunch* plaintiffs' counsel's letter to NAS's attorney, *see supra* at 1155, we nevertheless deem it unnecessary to remand to the trial court for reconsideration under a proper balancing analysis. In view of the time constraints of this litigation,[13] and because we have virtually no doubt as to how the

---

**12.** *See Bredice, supra* note 4, 50 F.R.D. at 251; *Mewborn, supra* note 4, 101 F.R.D. at 693.

**13.** The *Bunch* case has already been scheduled for trial.

trial court would rule on remand, we choose under these particular circumstances to decide this case on the full record presented to us. We are satisfied, for the reasons stated above, that a ruling granting discovery would most likely constitute an abuse of discretion.

*Affirmed.*