Jewel PHILLIPS, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 96–CV–1801.

District of Columbia Court of Appeals.

Argued May 7, 1998.

Decided July 2, 1998.

Patrick T. Hand, Washington, DC, for appellant.

Sheila Kaplan, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.

Before SCHWELB and FARRELL, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:

The court-appointed Special Administrator of the estate of a prisoner who hanged himself at the District of Columbia Jail brought this wrongful death and survival action against the District of Columbia, alleging that the decedent's death was proximately caused by negligence on the part of the District's agents and employees. The case was tried in the Superior Court before a judge and jury. At the conclusion of the plaintiff's case-in-chief, the trial judge granted the District's motion for a directed verdict, holding that the plaintiff had failed to establish a national standard of care or a violation thereof. The plaintiff appeals; we reverse the judgment.

## I.

### THE FACTS

A. *The decedent's arrest and suicide.*

On or about October 7, 1994, the decedent, Bentley G. Ross, then thirty-two years old, was behaving erratically on the premises of a

Crestar Bank in northwest Washington, D.C. Police officers were called to the scene. When officers questioned Ross as to whether he was in possession of a weapon, he disclosed that he had a handgun in his bag. Ross was then placed under arrest.

On the following day, Ross was arraigned in the Superior Court and charged with carrying a pistol without a license. The presiding judge ordered that Ross be detained pending a forensic examination, and Ross was transferred to the District of Columbia Jail pursuant to a commitment order on which the following handwritten notation appeared:

* FORENSIC *

* NO BOND *

The "FORENSIC" designation was a potentially significant one for officials at the jail. Approximately sixteen months before Ross' arrival at that facility, the Department of Corrections (DOC) had issued a departmental directive "establish[ing] uniform guidelines and procedures for mental health service delivery to residents housed in the Detention Facility." *See* DOP 6014.1a (May 13, 1993). This directive provided, *inter alia*, as follows:

> Residents ordered by the Court to be housed on the Mental Health Units to undergo Competency or Criminal Responsibility Examinations shall be transferred to the Mental Health Unit. . . .

The plaintiff introduced testimony showing that jail officials understood this directive to require them to place in the Mental Health Unit any prisoner with the word "FORENSIC" noted on his commitment form. Nevertheless, Ross was not placed in the Mental Health Unit, but was housed instead in the open population.

In the early morning of October 10, 1994, Ross, who was apparently being harassed by other prisoners, expressed fear for his safety. He asked to be placed in protective custody. Jail officials moved Ross to "Northeast One," an "intake cellblock" consisting of eighty

cells. The correctional officers in charge of the cellblock were not advised that Ross had a mental problem of any kind.

Ross never left the intake cellblock alive. A prisoner in a nearby cell testified that, on the morning of his death, Ross became agitated. According to this inmate, Ross was begging to be released from his cell, even if only to sweep the floor. The jail staff did not respond to this request, however, and at 10:26 a.m., a second inmate advised an officer that there might be a problem in Ross' cell. The officers entered the cell and found Ross "in a sitting-like position between the toilet and the foot of the bunk," with a sheet tied around his neck. The other end of the sheet was tied to the top bunk. Shortly thereafter, a physician determined that Ross was dead. Ross had hanged himself with a bedsheet.

Ross' suicidal activities had escaped the notice of the staff of the jail. There was testimony that jail officials maintained a log book which contained contemporaneous written entries reflecting relevant activity in the unit. The log book did not contain a single entry for the period from 8:40 a.m. to 10:00 a.m.[1]

B. *The trial court proceedings.*

On February 14, 1995, Jewel Phillips, Ross' aunt, was duly appointed by a court in the State of Kansas to serve as the administrator of Ross' estate. On May 23, 1995, Ms. Phillips filed suit against the District under the Wrongful Death Act, D.C.Code § 16–2701 (1997), and the Survival Act, D.C.Code § 12–101 (1995). Ms. Phillips claimed, *inter alia*, that notwithstanding the "FORENSIC" notation on Ross' commitment order, jail officials had negligently failed to place Ross in the Mental Health Unit. Ms. Phillips also alleged that the officers at the intake cellblock failed to take measures to maintain continuous observation of Ross. Ms. Phillips claimed that these and other acts of negligence proximately caused Ross to suffer emotional distress and led to his subsequent death. Ms. Phillips asked the court to award

---

1. Of the three officers responsible for the unit, two had left to participate in a shakedown of prisoners elsewhere at the jail. The third officer

was in the glass-encased "bubble" which served as a control booth. The interior of Ross' cell was not visible from the bubble.

substantial compensatory and punitive damages.

The case was tried before the trial judge and a jury on November 18 and 19, 1996. The plaintiff introduced testimony relating the events which we have described above, and which culminated in Bentley Ross' suicide. The plaintiff also called Joseph Rowan, an experienced correctional administrator, as an expert witness on proper prison administration and related issues. Rowan testified extensively regarding the standard of care applicable to the treatment of jail inmates with mental health problems, as well as the standard relating to the treatment of prisoners generally. This appeal turns largely on the question whether Rowan's testimony was sufficient to establish a national standard of care and its breach by officials or employees of the District of Columbia Jail.

With respect to the handling of prisoners with mental health problems, Rowan testified that the applicable standard of care was set forth in Standard No. 110 of the American Medical Association's "Standards for Health Services in Jails," which Rowan quoted in pertinent part as follows:

> Psychiatric and other acute medical problems identified either at receiving screening or after admission must be followed up by medical staff.

> Suicidal and psychotic patients are emergencies and should be held for only a minimum time necessary but no longer than 12 hours before emergency care is provided. Inmates awaiting emergency evaluation should be housed in a specially-designated area with constant supervision by trained staff.

> [Constant supervision is defined as] adequate staffing security [sic] to help inhibit suicide and assault, i.e., staff within sight or sound of all inmates.

Rowan also referred to DOP 6014.1a, the DOC directive relating to court-ordered forensic admissions, and he expressed the opinion that, based on Ross' conduct, both at the Crestar Bank prior to his arrest and in his cell thereafter, Ross was a suicide risk. Rowan concluded that the failure of the jail officials to place Ross in the Mental Health Unit was a violation of the applicable standard of care.

Rowan also testified that employees of the District of Columbia violated the national standard of care after Ross was transferred to the intake cellblock:

Q Please continue.

A They did not monitor him as would be done by reasonable officers and staff. The log showed that there was no log entry for monitoring from 8:30 in the morning until 10 o'clock.

Q What day are you talking about?

A October 10, the day that he attempted suicide.

Q What are the standards of care which pertain to the monitoring of inmates in custody in a jail?

A Well, the standard of care, it's on different levels depending on the severity of suicide risk and also general population. Starting there, where people are not suicidal [or] mentally ill, which does impact in this case and my testimony.

The national standards for monitoring people who are just general population inmates, nothing special about them, is that an officer should be inside the housing unit or immediately adjacent so as to be able to respond promptly, which is immediately, to handle any emergency. And that's American Correctional Association standard developed a number of years ago and still in existence.

Q How frequently are so-called normal inmates, or inmates in the general population, how frequently are they supposed to be observed?

A Maximum of 30 minutes and then for other levels much more frequently, including suicide continuously as the American Correctional Association 1991 standards outline.

Rowan was of the opinion that the officers at Northeast One "clearly ... did not exercise reasonable monitoring and observation" of Ross, and that "the officers if properly staffed should have been inside the housing unit or immediately adjacent so that they could respond to an emergency promptly." Finally, Rowan testified that if reasonable

practices had been followed, then in his opinion[2] "that could have stopped any suicide attempt."

### C. *The trial judge's decision.*

At the conclusion of the plaintiff's case, counsel for the District made an oral motion for a directed verdict. Following extensive argument, the judge granted the motion. In the judge's view, Rowan's testimony did not establish a national standard of care, in that Rowan had failed to identify any prison system which utilized the standards on which he relied. The judge also pointed out that AMA Standard No. 110 dealt with "suicidal and psychotic patients," and that the plaintiff had failed to establish that jail officials knew or should have known that Ross fell within either of these categories. Finally, the judge ruled that the DOC's internal directive "is not a standard [of care] and may not be relied upon as such," because such a directive "can be either higher or lower than the standard."

In granting the District's motion, the judge focused almost exclusively on the plaintiff's claim that the jail officials had violated the standard of care applicable to inmates with mental health problems. The judge did not discuss, at least explicitly, the plaintiff's claim that by deficient monitoring of Ross during the hours he spent in Northeast One on the final day of his life, the District had failed to comply with the standard of care relating to all inmates, regardless of their mental health.

## II.

## LEGAL DISCUSSION

### A. *The standard of review.*

Rule 50(a) of the Superior Court's Rules of Civil Procedure authorizes the trial judge to direct a verdict against a party on an issue when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. As the United States Court of Appeals explained more than half a century ago,

[t]he rule applicable in the District of Columbia on a motion for a directed verdict, in an action founded upon negligence, is that the evidence must be construed most favorably to the plaintiff; to this end he is entitled to the full effect of every legitimate inference therefrom; if upon the evidence, so considered, reasonable men might differ, the case should go to the jury; if, on the other hand, no reasonable man could reach a verdict in favor of the plaintiff, the motion should be granted; a mere scintilla of evidence is not sufficient; the question is not whether there is any evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party upon whom the *onus* of proof is imposed; the burden being upon the plaintiff to establish the negligence and injury alleged, if the evidence fails adequately to support either element the motion should be granted.

*Shewmaker v. Capital Transit Co.*, 79 U.S.App.D.C. 102, 103, 143 F.2d 142, 143 (1944) (footnote omitted); *see also Bauman v. Sragow*, 308 A.2d 243, 244 (D.C.1973) (per curiam). We have applied this standard in actions for negligence brought by prisoners against the District of Columbia. *See, e.g., District of Columbia v. Bethel*, 567 A.2d 1331, 1334 (D.C.1990) (citing *Bauman*).

■ Whether the evidence, viewed in the light most favorable to Ms. Phillips, was sufficient to go to the jury is a question of law, which we consider *de novo*. *See United States ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676, 680 (10th Cir.1998); *Gunning v. Cooley*, 58 App.D.C. 304, 307, 30 F.2d 467, 470 (1929) (concurring opinion), *aff'd*, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720 (1930).

### B. *The plaintiff's burden.*

■ In this jurisdiction, the legislature has assigned to the DOC statutory responsibility for "the safekeeping, care, protection, instruction, and discipline of all persons committed to [its] institutions." D.C.Code § 24–442 (1996). Under the statute, as under the common law, prison authorities and employees are required to exercise reasonable care

---

**2.** Rowan used the word "feeling" rather than "opinion," but the context reveals that he was

presenting his expert opinion on the issue of causation.

in carrying out these obligations. *Hughes v. District of Columbia*, 425 A.2d 1299, 1302 (D.C.1981). Ms. Phillips asserts in this case that the District has failed to exercise reasonable care as required by § 24–442, and that the District's negligence proximately caused the decedent's suffering and death.

As we recently stated in *Clark v. District of Columbia*, 708 A.2d 632, 634 (D.C. 1997), a case involving a suicide by a juvenile resident of the District's Receiving Home for Children, "[t]he plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." (Citations omitted.) In general, the standard of care owed by the District to persons in its custody is a matter beyond the ken of the average juror. *Id.* at 634–35; *see also Toy v. District of Columbia*, 549 A.2d 1, 7 (D.C.1988); *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C.1990). Accordingly, the plaintiff was required to establish the applicable standard of care, as well as a breach thereof, by expert testimony. *See Clark, supra*, 708 A.2d at 634–35; *District of Columbia v. Moreno*, 647 A.2d 396, 398–99 (D.C.1994).[3]

Where, as in this case, the plaintiff must depend on expert testimony, it is not sufficient for the expert to explain what he or she would have done under similar circumstances, or to declare that the District violated the national standard of care. *Clark, supra*, 708 A.2d at 635. On the contrary,

> the expert must clearly articulate and [refer to] a standard of care by which the defendant's actions can be measured.... Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable

governmental facilities or to some standard nationally recognized by such units. If the expert fails to do so, a directed verdict for the defendant is properly granted.

*Id.* (Citation and internal quotation marks omitted.)

The District asserted in *Bethel, supra*, and again contends here, that the American Correctional Association's *Standards for Adult Correctional Institutions* (2d ed.1981) (the ACA standards) are merely aspirational, and that they cannot form the basis for expert testimony as to the applicable standard of care. We rejected that contention in *Bethel*, 567 A.2d at 1333, but we have since made it clear that the expert must testify as to *specific* ACA standards, *Moreno, supra*, 647 A.2d at 401, and must relate them directly to the defendant's conduct. *Clark, supra*, 708 A.2d at 635.

C. *The District's alleged noncompliance with the standard applicable to prisoners with mental health problems.*

Ms. Phillips argued in the trial court, and continues to maintain on appeal, that she presented sufficient evidence to go to the jury on the question whether the District failed to comply with the standard of care applicable to prisoners whose commitment forms were marked "FORENSIC." We agree with the trial judge, however, that a directed verdict was appropriate as to this issue.

In his expert testimony on behalf of the plaintiff, Mr. Rowan focused primarily on AMA Standard No. 110 and on the DOC's internal directive. We conclude, as a matter of law, that neither of these provisions could support a verdict for the plaintiff.

We note at the outset that Rowan never explicitly testified that AMA Standard No. 110 represented a national standard of care,

---

**3.** Ms. Phillips argues in her brief that expert testimony was not required in this case because "Appellant proved, out of the mouths of the Appellee's own employees, that Appellee provided *no* safekeeping, care, and protection to Decedent." (Emphasis in original.) In our view, this assertion substantially overstates the plaintiff's proof. Although the plaintiff arguably established noncompliance with the DOC's internal directive as to the treatment of prisoners with "FORENSIC" noted on their commitment forms,

and although such noncompliance could arguably be shown without expert testimony, that directive does not constitute a standard of care. *See Clark, supra*, 708 A.2d at 636–37. Once it is recognized that the plaintiff could not prove her case simply by showing a violation of the DOC directive, the principal issues in this case—whether the plaintiff established the applicable standard of care, and whether she proved a breach thereof—are demonstrably outside the ken of a lay jury.

nor did he identify any institutions in which it was in effect. Rowan did state that Standard No. 110 "stemmed from" a conference in Williamsburg, Virginia, in 1972, at which Chief Justice Burger "prevailed upon the American Medical Association to do a national study of jail health care because of the serious problems which seemed to exist and that's how the standards got started." In addition, on two occasions, counsel for plaintiff referred to a "national standard" in his question, and the witness apparently accepted counsel's characterization, but in each instance it was the lawyer, not the witness, who used the critical words.[4] Notwithstanding considerable prompting of counsel by the trial judge, however, Rowan was never asked to describe the applicable national standard for the jury. If he identified that standard at all with respect to the "forensic" prisoner issue, it was by implication, and not directly.

■ But even assuming, without deciding, that Rowan's testimony, viewed in the light most favorable to the plaintiff, was sufficient to establish that AMA Standard No. 110 is a national standard of care, the plaintiff did not prove a breach of that standard. On its face, Standard No. 110, from which we have quoted at page [6], *supra*, applies to "suicidal and psychotic patients." There is no evidence that jail officials knew or should have known, at the time Ross was brought to the facility, that he was either suicidal or psychotic. The word "FORENSIC" was written on Ross' commitment form because, at arraignment, the prosecutor had requested a competency examination on account of Ross' erratic behavior. There was no indication of suicidal tendencies, and Ms. Phillips' attorney expressly admitted during argument of the District's motion for a directed verdict that "our case is not based on the fact that Mr. Ross came to the jail as a known suicide risk."

■ Counsel went on to state, instead, that he was relying on the DOC's internal

directive. As the trial judge correctly held, however, that directive "is not a standard [of care] and may not be relied upon as such." [5] This is so because

> "agency protocols and procedures, like agency manuals, do not have the force or effect of a statute or an administrative regulation," but rather "they provide officials with guidance on how they should perform those duties which are mandated by statute or regulation." *Wanzer v. District of Columbia,* 580 A.2d 127, 133 (D.C. 1990). Because the Suicide Prevention Plan is only an unpublished internal agency procedure and not a statute or regulation, it cannot embody the standard of care under a negligence *per se* theory.... To hold otherwise would create the perverse incentive for the District to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions.

*Clark, supra,* 708 A.2d at 636 (additional citations omitted). We therefore conclude that a directed verdict was appropriate with respect to this part of the plaintiff's case.

D. *The District's alleged noncompliance with the standard applicable to inmates generally.*

■ The plaintiff's appeal fares better with respect to the question whether jail officials were negligent in failing adequately to monitor Ross' activities in his cell in Northeast One on the final morning of his life. As to that issue, which the judge did not directly address, Ms. Phillips' expert explicitly defined the national standard of care, and he clearly articulated the manner in which that standard was breached. We con-

---

4. *See, e.g.,* the following question and answer:

> Q. These national standards of care that are defined in the—by the American Correctional—Corrections Association and other organizations, such as the American Medical Association, are they reduced to written publications?
> A. Yes.

5. We also note that if DOP 6014.1a is read literally, it does not apply to Ross' case. The directive refers to "Residents *ordered by the Court to be housed on the Mental Health Units.*" (Emphasis added.) The commitment form for Ross, which constituted the only relevant order of the court, said nothing as to where Ross was to be housed.

clude that this part of the case should have gone to the jury.

██ Mr. Rowan testified, as we have seen, that "the national standard for monitoring people who are just general population inmates, nothing special about them," is set forth in a specific ACA standard. Rowan stated that, according to that standard, "an officer should be inside the housing unit, or immediately adjacent, so as to be able to respond promptly, which is immediately, to handle any emergency." He further explained that inmates in the general population are supposed to be observed at least once every thirty minutes.[6] In Rowan's opinion, the jail officials did not comply with this standard,[7] and their failure to do so prevented them from learning of Ross' suicide attempt until it was too late.

██ The District argues that Rowan did not identify in his testimony any specific institutions in which the standard described by him was in effect. We certainly agree that the plaintiff's case would have been stronger if her counsel had elicited such information and if her expert witness had provided it.[8] We do not believe, however, that this omission was fatal. We recently stated that "the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable governmental facilities *or* to some standard nationally rec-

ognized by such units." *Clark, supra,* 708 A.2d at 635 (emphasis added). The two types of expert testimony sufficient to establish the standard are stated in the alternative—either one makes the grade. This conclusion is consistent with our previous cases, in which the decisive issue has been whether the expert "testified regarding *specific* standards including specific ACA standards," *Moreno, supra,* 647 A.2d at 401 (emphasis added) (citing *Bethel, supra,* 567 A.2d at 1334), or whether instead he merely expressed an opinion that "District of Columbia regulations or ACA standards [had been violated], unaccompanied by any evidence of what those regulations or standards provide." *Carmichael, supra,* 577 A.2d at 315; *see also id.* (expert "did not single out any particular [ACA] provisions)."

In the present case, a well-qualified expert used the word "national" in describing the standard of care. It is reasonable to infer from his testimony that such a standard is "nationally recognized" by comparable governmental units, as required by *Clark.* Viewing the record, as we must, in the light most favorable to Ms. Phillips, and giving the plaintiff the benefit of every reasonable inference from the evidence, we conclude that the trial judge erred in directing a verdict insofar as the standard of care applicable to inmates in the general population was concerned.[9]

---

6. Rowan was apparently referring to ACA Standard No. 2–5174, which reads as follows:

    Written policy and procedure require that all high and medium security inmates are personally observed by a correctional officer at least every 30 minutes, but on an irregular schedule. More frequent observation is required for those inmates who are violent, suicidal, mentally disordered or who demonstrate unusual or bizarre behavior. (Detention–Essential, Holding–Essential)

    DISCUSSION: The physical design of inmate living units often does not permit observation from correctional officer posts. Inmates classified as high or medium security should be under close surveillance. Correctional officers should personally observe each inmate so classified at least every half hour, but care should be taken so that the inmate does not anticipate the appearance of the officer.

    Although the printed text of ACA Standard No. 2–5174 was excluded as an exhibit by the Pretrial Order, Rowan's testimony orally incorporated the standard. The record does not disclose whether Ross was a "high or medium security inmate," but Rowan apparently believed that he

was, and Rowan applied the ACA standard to Ross. We note in that regard that Ross was apprehended with a handgun in his bag. Moreover, as stated earlier, there was testimony that after Ross had expressed fear for his safety, he was moved to Northeast One, and that he was thus at least inferentially classified at a higher security level.

7. In this respect, Rowan's opinion is based on ample evidence, including in particular the telltale lack of any entries in the cellblock's log during the critical hour and twenty minutes.

8. Counsel for the plaintiff claims that he attempted to elicit testimony as to other institutions at which the standard of care described by Rowan was in effect and that the judge excluded the evidence. The record does not bear out counsel's claim; the excluded evidence did not relate to the existence of institutions which applied that standard of care.

9. The parties have not addressed, and we do not decide, the question whether Ross' intentional suicide broke the chain of causation.

## III.

## CONCLUSION

For the foregoing reasons, the judgment is reversed,[10] and the case is remanded for further proceedings consistent with this opinion.

██  *So ordered.*[11]

10. Although we reverse the judgment, we reiterate that a directed verdict in favor of the defendant was appropriate as to the plaintiff's contention that the District failed to comply with the standard of care applicable to prisoners with mental health problems. Counsel have not discussed the question whether, under these circumstances, the plaintiff may again present evidence, at a second trial, with respect to the "forensic" prisoner issue, and we take no position with respect to that issue. *Cf.* Super.Ct.Civ.R. 50(a) (a directed verdict may be granted as to an issue regarding which a party's evidence is insufficient to go to the jury).

11. Ms. Phillips also contends that the trial judge made a number of erroneous evidentiary rulings during the course of the trial. Some of the issues relating to the challenged rulings may not arise at a retrial or, if they do, this may occur in a different evidentiary context. To the extent that we deem appellate disposition to be appropriate at this time, we conclude as follows:

1. "An evidentiary ruling by a trial judge on the relevancy of a particular item is a highly discretionary decision that will be upset on appeal only upon a showing of grave abuse." *Roundtree v. United States,* 581 A.2d 315, 328 (D.C.1990) (citations and internal quotation marks omitted).

2. The trial judge did not abuse his broad discretion in excluding from evidence the report on Ross' suicide of the DOC's "Suicide Investigation Committee." *See New York Life Ins. Co. v. Taylor,* 79 U.S.App.D.C. 66, 72–75, 147 F.2d 297, 303–06 (1944); *Plough, Inc. v. National Academy of Sciences,* 530 A.2d 1152, 1157–58 (D.C.1987). If, at a retrial, an expert witness testifies that his or her opinion is based, in part, on facts disclosed in this Report, the expert should be permitted wide latitude in using the Report as a source and to explain the basis for its use. *In re Melton,* 597 A.2d 892, 902–03 (D.C.1991) (en banc).

3. The trial judge did not abuse his discretion in excluding from evidence either Ross' resume or the records of Ross' prior hospitalization. We do not, however, hold as a matter of law that these items of evidence were inadmissible. On retrial, the judge is free, in the exercise of discretion, to weigh the probative value and prejudicial effect of each of these items on the basis of the circumstances then existing.