James E. McMILLAN III, Plaintiff,

v.

TOGUS REGIONAL OFFICE, DE-
PARTMENT OF VETERAN AF-
FAIRS, National Academy of Sci-
ences, Institute of Medicine, et al.,
Defendants.

No. 03–CV–1074 (JBW).

United States District Court,
E.D. New York.

Nov. 25, 2003.

James E. McMillan III, pro se.

Robert H. Pees, Natasha G. Kohne, Jo-
seph P. Esposito, P.C., Akin, Gump,
Strauss, Hauer & Feld LLP, National
Academy of Sciences (James Wright, Gen-
eral Counsel, Audrey B. Mosley, Deputy
General Counsel, of Counsel), for National
Academy of Sciences and the Institute of
Medicine.

MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

I. *Introduction*

Lawsuits such as this one would signifi-
cantly imperil and inhibit free and effective
scientific inquiry and research, threatening

the public interest. It will not be permitted to proceed.

Plaintiff seeks a declaratory judgment that the National Academy of Sciences and Institute of Medicine (collectively, the Academies) failed to adequately review scientific evidence concerning the association between the herbicide Agent Orange exposure and illnesses among Vietnam veterans. The series of studies were required by the Agent Orange Act of 1991. Pub.L. No. 102–4, § 3 (1991) ("Act"). He also seeks injunctive relief.

The Academies, private non-governmental institutions that support research on scientific issues pursuant to federal charter, move to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss by some dozen federal government and international agencies has been granted. *See* Order filed November 18, 2003. For reasons indicated below, the remaining defendants are now dismissed.

## II. *Parties and Claims*

Plaintiff is a veteran of the Vietnam War, having served from November 1966 to June 1968. He distinguished himself in combat. He was awarded the Vietnam Service Medal with Three Bronze Stars, an Army Commendation Medal, a Meritorious Unit Commendation, and the Vietnam Gallantry Cross with a Palm Unit Citation. He claims that he was exposed to Agent Orange during his tour of duty: he ingested it by drinking contaminated water while taking government-supplied malaria and water purification pills; he consumed herbicide-contaminated meat; mosquitos injected herbicides they had imbibed when they bit; and he constantly inhaled fumes from burning herbicide-contaminated plants. Plaintiff attributes his own ailments to Agent Orange exposure, including, among twelve diseases, serious respiratory disorders; and he claims that

teratogenetic effects caused his children to be born with birth defects. He receives a 30% disability benefit from the Veteran's Administration for a Post Traumatic Stress Disorder arising from his Vietnam service.

It is plaintiff's view that the Academies' research authorized under the Act is incomplete and, particularly as it relates to himself and his children, inaccurate. He contends that "All parties I have named ... [are] guilty of a Conspiracy Cover–Up."

It is impossible to question the plaintiff's *bona fides.* Sympathy for his suffering and that of his family—and for many others who served in Vietnam—is deeply felt by all his fellow citizens.

The National Academy of Sciences (Academy) is a federally-chartered corporation. 36 U.S.C. § 150301. It is authorized to construct its own organization, including adopting a constitution and bylaws. 36 U.S.C. § 150302. Pursuant to its federal charter, the Academy, "[o]n request of the United States Government, [will] investigate, examine, experiment, and report upon any subject of science or art." 36 U.S.C. § 150303.

Although federally chartered, the Academy is a private nonprofit non-governmental organization, a "self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare." Inst. of Med., *Veterans and Agent Orange: Update 2002,* (the "Report") at iv; *see LeFevre v. Secretary, Dept. of Veterans Affairs,* 66 F.3d 1191, 1193 (Fed.Cir.1995), *cert. denied,* 517 U.S. 1188, 116 S.Ct. 1674, 134 L.Ed.2d 778 (1996); *see also* Agent Orange Act of 1991, at § 3(a), Pub. L No. 102–4, 105 Stat. 11 (1991) (codified as amended at 38 U.S.C. § 1116 & note).

The Institute of Medicine ("Institute") was established in 1970 by the Academy to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to public health. The Institute acts under the power granted to the Academy by its congressional charter to act as an advisor to the federal government. *See* Academy Constitution, Art. II, Section 10 ("The Institute of Medicine is established as a separate membership organization of the National Academy of Sciences under terms of a charter adopted by the Council of the National Academy of Sciences.").

No federal funds are directly appropriated to the Academy for its activities. It prepares reports of a scientific and technical nature, primarily for the federal government pursuant to contracts, grants and cooperative agreements with federal agencies. Although the majority of Academy reports are prepared pursuant to contracts, grants and cooperative agreements with federal sponsors, it performs many studies which are supported solely with Academy funds, and some studies which are supported by private foundations. *See* Report of the Treasurer to the Council for the Year Ended December 31, 2002, at 4.

III. *Agent Orange Studies*

Because most Academy reports are pursuant to contracts or grants from outside the Academy, the subjects are generally specified by the sponsoring entity. The Agent Orange reports were prepared in response to Public Law 102–4, the Agent Orange Act of 1991 ("the Act"), adopted in February 1991. The Act, codified as 38 U.S.C. § 1116, directed the Secretary of Veterans Affairs to contract with the Academy to conduct an independent, comprehensive review and evaluation of scientific and medical information regarding the health effects of exposure to Agent Orange. *See* Act, § 3(b).

The Academy was asked to "determine (to the extent that available scientific data permit meaningful determinations)," the following regarding associations between specific health outcomes and exposure to chemicals in herbicides:

(A) whether a statistical association with herbicide exposure exists, taking into account the strength of the scientific evidence and the appropriateness of the statistical and epidemiological methods used to detect the association;

(B) the increased risks of the disease among those exposed to herbicides during service in the Republic of Vietnam during the Vietnam era; and

(C) whether there exists a plausible biological mechanism or other evidence of a causal relationship between herbicide expose and the disease.

Act, § 3(d).

The Academy's most recent report on Agent Orange (Report) was supported by Contract No. V101(93) P–1637 between the Academy and the United States Department of Veterans Affairs. In conducting its work, the Academy operated independently of the Department of Veterans Affairs and other government agencies. *See* Report at ii.

Consisting of over six hundred pages, the Report is titled, "Veterans and Agent Orange, Update 2002, Committee to Review the Health Effects in Vietnam Veterans of Exposure to Herbicides (Fourth Biennial Update), Board on Health Promotion and Disease Prevention, Institute of Medicine of the National Academies (The National Academic Press, Wash. D.C. 2003)".

While the Act specified the issues to be covered by Academy reports, *see* Act, § 3(d), it required the Secretary of Veter-

ans Affairs to make an independent judgment as to whether to compensate any particular veteran for exposure to Agent Orange. *See LeFevre*, 66 F.3d at 1198–99. The Academy was not asked to and did not make judgments regarding specific cases in which individual veterans claimed injury from herbicide exposure. *See* Report at 2.

The Academy is required by its contract with the United States to suggest further studies. It may

make any recommendations it has for additional scientific studies to resolve areas of continuing scientific uncertainty relating to herbicide exposure. In making recommendations for further study, the Academy shall consider the scientific information that is currently available, the value and relevance of the information that could result from additional studies, and the cost and feasibility of carrying out such additional studies.

Act at § 3(e); *see also* Report at 10. Recommendations for additional research are set forth on page 10 and in Chapter 10 of the Report. Some of the recommended action includes research by agencies of the federal government. *See id.* The Academy will not supervise research conducted by the federal government, nor will it decide what, if any, additional research is actually undertaken, or what entity will conduct it.

Pursuant to the statute, a number of reports have been issued by the Academy in connection with its Agent Orange studies. For each report the Academy convened a committee of volunteer scientists, representing various relevant scientific disciplines, who were assisted by Academy personnel.

The Academy's careful procedures in preparing a report are summarized in *Plough Inc. v. National Academy of Sciences*, 530 A.2d 1152, 1156 (D.C.1987). Committee members are required to disclose any potential sources of bias or conflicts of interest related to the topic under study. Effective December 17, 1997, they are subject to section 15 of the Federal Advisory Committee Act. The Academy is required to "make its best efforts to ensure that (A) no individual appointed to serve on the committee has a conflict on interest that is relevant to the functions to be performed, unless such conflict is promptly and publicly disclosed and the Academy determines that the conflict is unavoidable ..." *See* Pub.L. No. 105–153, 111 Stat. 2689 (1997), codified at 5 U.S.C. § 552 Appendix A.

There is no governmental supervision of the preparation of Academy reports. This includes the reports on Agent Orange.

The background for the most recent Agent Orange studies are sufficiently sketched in the preface to the Report (ix-xi) as follows:

In response to the concerns voiced by Vietnam veterans and their families, Congress called upon the National Academy of Sciences (NAS) to review the scientific evidence on the possible health effects of exposure to Agent Orange and other herbicides.... The creation of the first NAS Institute of Medicine committee, in 1992, underscored the critical importance of approaching these questions from a non-partisan scientific standpoint. The original Committee to Review the health Effects in Vietnam Veterans of Exposure to Herbicides realized from the beginning that it could not conduct a credible scientific review without a full understanding of the experiences and perspectives of veterans. Thus, to supplement its standard scientific process, the committee opened several of its meetings to the public in order to allow veterans and other interested individuals to voice their concerns and opinions, to provide personal information about individual exposure to herbicides

and associated health effects, and to educate committee members on recent research results and studies still under way. This information provided a meaningful backdrop for the numerous scientific articles that the committee considered.

*Veterans and Agent Orange: Health Effects of Herbicides Used in Vietnam* (abbreviated as *VAO* in this report) reviewed and evaluated the available scientific evidence regarding the association between exposure to 2, 3, 7, 8–tetrachlorodibenzo–*p*–dioxin (TCDD) or other chemical compounds contained in herbicides used in Vietnam and a wide range of health effects. The report provided information for the secretary of veterans affairs to consider as the Department of Veterans Affairs carried out its responsibilities to Vietnam veterans. It also described areas in which the available scientific data were insufficient to determine whether an association exists and provided the committee's recommendations for future research.

The Law .... also tasked the NAS to conduct biennial updates that would review newly published scientific literature regarding statistical associations between health outcomes and exposure to TCDD and other chemical compounds in these herbicides. The first of these, *Veterans and Agent Orange: update 1996 (Update 1996)* was published in March of that year. The second, *Veterans and Agent Orange: Update 1998 (Update 1998)* was published in 1999. The third, *Veterans and Agent Orange: Update 2000 (Update 2000)* was published in 2001. The focus of this fourth updated review is on scientific studies published since the release of *Update 2000*. To conduct the review, the IOM established a committee of 10 members representing a wide range of expertise to take a fresh look at the studies reviewed in VAO, *Update 1996, Update 1998,* and *Update 2000* along with the newest scientific evidence. In order to provide a link to the experience and expertise developed by the previous committees, seven of the members of the committee responsible for this report were recruited from the committee responsible for *Update 2000.* All committee members were selected because they are leading experts in their field, have no conflicts of interest with regard to the matter under study, and have taken no public positions concerning the potential health effects of herbicides in Vietnam veterans or related aspects of herbicide or TCDD exposure.

The committee worked on several fronts in conducting this updated review, always with the goal of seeking the most accurate information and advice from the widest possible range of knowledge sources. Consistent with procedures of the NAS, the committee met in a series of closed sessions and working group meetings in which members could freely examine, characterize, and weight the strengths and limitations of the evidence. It also convened two open meetings in April and September of 2002 to provide the opportunity for veterans and veterans service organizations, researchers, policymakers, and other interested parties to present their concerns, review their research, and exchange information directly with committee members, the oral presentations and written statements submitted to the committee are described [*infra* ].

In addition to its formal meetings, the committee actively and continuously sought information from, and explained its mission to, a broad array of individuals and organizations with interest or expertise in assessing the effects of exposure to herbicides. The committee also heard from the public through telephone calls, letters, and e-mails ...

The committee also benefitted from the assistance of several scientists and researchers who generously lent their time and expertise to help give committee members insight on particular issues, provide copies of newly-released research, or answer queries concerning their work....

Report at ix-xi (emphasis in original). The Report's meticulous approach may be gleaned from the following excerpt:

### Determining Whether a Statistical Association Exists

In trying to determine whether a statistical association exists between any of the herbicides used in Vietnam or the contaminant 2,3,7,8–tetrachlorodibenzo–$p$–dioxin (TCDD) and a health outcome, the committee found that the most helpful evidence came from epidemiologic studies-investigations in which large groups of people are studied to determine the association between the occurrence of particular diseases and exposure to the substances at issue. Epidemiologists estimate associations between an exposure and a disease in a defined population or group using measures such as relative risk, standardized mortality ratio, or odds ratio. Those terms describe the magnitude by which the risk or rate of disease is changed in a given population. For example, if the risk in an exposed population increases two-fold relative to an unexposed population, it can be said that the relative risk, or risk ratio, is 2.0. Similarly, if the odds of disease in one population are 1:20 and in another are 1:100, then the odds ratio is 5.0. Sometimes the use of terms such as relative risk, odds ratio, and estimate of relative risk is inconsistent, for instance when authors refer to an odds ratio as a relative risk. In this report *relative risk* refers to the results of cohort studies and *odds ratio* (an estimate of relative risk) refers to the results of case-control studies. An estimated relative risk greater than 1 could indicate a positive or direct association (that is, a harmful association), whereas values between zero and 1 could indicate a negative or inverse association (that is, protective association). A "statistically significant" difference is one that, under the assumptions made in the study and the laws of probability, would be unlikely to occur if there were not true difference and no biases.

Determining whether an observed association between an exposure and a health outcome is "real" requires additional scrutiny because there may be alternative explanations for the observed association. Those explanations include *error* in the design, conduct, or analysis of the investigation; *bias,* a systematic tendency to distort the measure of association so that it may not represent the true relation between exposure and outcome; *confounding,* distortion of the measure of association because of failure to recognize or account for another factor related to both exposure and outcome; and *chance,* the effect of random variation, which produces spurious associations that can, with a known probability, sometimes depart widely from the true relation. In deciding whether an association between herbicide exposure and a particular outcome exists, the committee examined the quantitative estimates of risk and evaluated their likelihood of being due to error, bias, confounding, or chance or of representing true associations.

In pursuing the question of statistical association, the committee recognized that an absolute conclusion about the absence of association may never be attained. As in science generally, studies of health outcomes after herbicide exposure cannot demonstrate that a purported effect is impossible or could never

occur. Any instrument of observation, including epidemiologic studies, is limited in its resolving power. In a strict technical sense, therefore, the committee cannot prove the absolute absence of an association between a health outcome and exposure to the herbicides or TCDD.

### Determining Increased Risk in Vietnam Veterans

Whether Vietnam veterans are at increased risk is relevant principally (but not exclusively) when there is evidence of a positive association between exposure and a health outcome. The best evidence for use in determining the risk is knowledge of the rate of occurrence of the outcome in Vietnam veterans who were exposed, the rate in those who were not exposed (the "background" rate in the population of Vietnam veterans), and the degree to which any other differences between exposed and unexposed veterans influence the difference in rates. When, as in most studies, exposure among Vietnam veterans has not been adequately determined, it is difficult to determine such an increased risk. Therefore, although the committees have found the available evidence (most of which is from studies of people exposed to dioxins or herbicides in occupational and environmental settings) sufficient for drawing conclusions about the association between herbicide exposure and a number of health outcomes, the lack of good data on Vietnam veterans, especially with regard to herbicide exposure, complicates the assessment of the increased risk of disease specifically among people exposed to herbicides during service in Vietnam.

### Evaluating the Evidence of a Biologic Mechanism

Chapter 3 details the experimental evidence that provides the basis of the assessment of biologic plausibility, that is, the extent to which a statistical association is consistent with biologic or medical knowledge. As with the epidemiologic evidence, the chapter concentrates on studies published in 2000–2002 but considers all relevant studies in drawing conclusions. The issue of whether a relationship between a particular chemical exposure and a particular health outcome reflects a true association in humans is addressed in the context of research regarding the mechanism of interaction between the chemical and biologic systems, evidence from animal studies, and evidence of an association between exposure and the occurrence of a health outcome in humans, including evidence from occupational and environmental chemical exposures. It must be recognized, however, that lack of data in support of a plausible biologic mechanism does not necessarily rule out the existence of an association.

### Issues in Evaluating the Evidence

To assess whether a given human health effect is associated with any of the exposures of interest, the committees concentrated on reviewing and interpreting human epidemiologic studies and experimental investigations that might contribute to biologic plausibility, weighing the strengths and limitations of the available evidence. Their assessments have both quantitative and qualitative aspects and take into account the nature of the exposures, health outcomes, and populations exposed; the characteristics of the evidence examined; and the approach taken to evaluate that evidence. Some of the aspects the committees have considered in evaluating the evidence are addressed below.

### Toxicology Studies

A valid surrogate-animal model for the study of a human disease must re-

produce, with some degree of fidelity, the manifestations of the disease in humans. Whole-animal studies or animal-based experimental systems continue to be used to study herbicide toxicity because they allow for rigid control of chemical exposures and close monitoring of health outcomes. Because many of the chemical exposures associated with diseases in humans have been confirmed in experimental studies, data derived from such studies are generally accepted as a valuable guide in the assessment of biologic plausibility. Whether a given effect occurs in an animal species, however, cannot always be used to establish whether it occurs in humans.

As discussed in Chapter 3, TCDD, a contaminant of 2,4,5–trichlorophenoxyacetic acid (2,4,5–T), is thought to be responsible for many of the toxic effects of the herbicides used in Vietnam. Attempts to establish correlations between the effects of TCDD in experimental systems and in humans are particularly problematic because there are end-point, sex-, and species-specific differences in susceptibility to TCDD. Some data indicate that humans might be more resistant than other species to the toxic effects of this chemical .... but other data suggest that, for some end points, humans may be at least as sensitive as some experimental animals.... Differences in susceptibility have a toxicokinetic component because elimination is slower in humans than in rodents....

It is also important, however, to consider TCDD's mode of action when considering species and strain differences. There is a consensus that most of the toxic effects of TCDD involve interactions with the aryl hydrocarbon receptor (AhR), a protein that binds TCDD and other aromatic hydrocarbons with high affinity. Formation of an active complex involving the receptor, ligand (the TCDD molecule), and other protein factors is followed by interactions in DNA changes that alter the expression of genes involved in the regulation of cellular processes. The development of AhR-knockout mice (mice lacking the AhR) has helped to establish a definitive association between the AhR and TCDD-mediated toxicity. Toxicodynamic interactions are important because the affinity of TCDD for the AhR is species- and strain-specific (Lorenzen and Okey, 1991), and responses to occupancy of the receptor vary among cell types and developments stages. The drug-metabolizing enzymes that are induced by TCDD in humans are different from those induced in rodents (Neubert, 1992); this suggests that the effect of different genetic backgrounds on AhR function is not completely understood. It is generally accepted that genetic susceptibility plays a key role in determining the adverse effects of environmental chemicals. Genetic susceptibility is central in the assessment of biologic plausibility because if polymorphisms of the gene encoding the AhR exist in humans as they do in laboratory animals, some people would be at greater risk or at lesser risk for the toxic and carcinogenic effects of TCDD.

Ultimately, however, the challenge in the assessment of the biologic plausibility of the toxicity of herbicides and TCDD is not restricted to understanding receptor-mediated events. The dose-response relationships that arise from multiple toxicokinetic and toxicodynamic interactions must also be considered. Gene-regulation models described to date do no consider the intricacies of the many interactions between the AhR and other proteins. Future attempts to define the quantitative relationship between receptor occupancy and biologic response to TCDD must consider that

multiple biochemical changes may influence the over-all cellular response.

### Epidemiologic Studies

To obtain information relevant to the evaluation of health effects of exposure to the chemicals of interest, the committee reviewed studies of cohort of people other than Vietnam veterans potentially exposed to the herbicides used in Vietnam (2,4,5–T, 2.4–dichlorophenoxyacetic acid [2,4–D], cacodylic acid, and picloram), TCDD, phenoxy herbicides, chlorophenals, and other compounds. The cohorts include chemical-production and agricultural workers, people thought to be exposed to large amount of herbicides or dioxins as a result of residing near the site of an accident or near areas used to dispose of toxic waste, and residents of Vietnam. The committees felt that considering studies of cohorts other than veterans could help address the issue of whether those compounds might be associated with particular health outcomes, even though the results would have only an indirect bearing on the increased risk of disease in veterans themselves. Some of the studies, especially those of workers in chemical-production plants, provide stronger evidence about health effects than studies of veterans because exposure was generally more easily measured and often was determined. Furthermore, the general magnitudes and durations of exposure to the chemicals were greater, and the studies were large enough to examine the health risks among people with varied exposure.

Because of the great differences among studies, the committee concluded that it was inappropriate to use a quantitative technique, such as meta-analysis, to combine individual results into a single summary measure of statistical association. Using such a summary measure would also inappropriately focus attention on one piece of information used by the committee, whereas, as discussed previously, many factors are important in evaluating the literature.

Although its full potential has yet to be realized, the application of molecular and cellular end points to epidemiologic research promises to increase the understanding of the association between herbicide exposure and the occurrence of various health outcomes. Such information might provide an important advantage in the assessment of biologic plausibility because biologically based epidemiologic data allow more accurate identification and measurement of exposure. For instance, the analytic data available on people known to have been exposed to herbicides during the Vietnam War constitute a valuable resource for the study of TCDD-related disease; documented TCDD body burdens provide a quantitative bridge between experimental studies and epidemiology. Taken together, experimental studies and epidemiologic investigations provide complementary perspectives from which to view human health effects of exposure to herbicides. However, it must be recognized that the ultimate test of associations between exposure and effects lies in data on human populations.

In recent years, the toxic equivalency factor (TEF) method of comparing the relative toxicity of dioxin-like chemicals has been used by several government agencies around the world. Although it is considered one of the best approaches to assessing the relative risk of complex mixtures of these contaminants, it is an interim approach, and it has several inherent uncertainties. TEFs are determined through inspection of the available congener-specific biologic and biochemical data on a compound and assignment of an order-of-

magnitude estimate of relative toxicity in comparison with TCDD. TEF values are by no means precise; they are the result of scientific judgment and expert opinion taking into account all the available data form on the congeners. The scientific data on which they are based may vary considerably, often by several orders of magnitude depending on the different biologic end points chosen for a particular chemical. Therefore, considerable uncertainty exists about the use of these values, and it is often difficult to quantify the uncertainty. Although the recent World Health Organization TEF values (Van den Berg et al., 1998) are most often cited and generally accepted, the values used can differ slightly among states, countries, and health organizations and with the classification scheme accepted by an agency. Nevertheless, most agencies in the United States, including the Environmental Protection Agency, support the basic approach as a "reasonable estimate" of relative toxicity. Furthermore, numerous countries and several international organizations have adopted it although, again, the accepted values may differ.

The TEF concept is based on the premise that the toxic and biologic responses of all the chemicals in question are mediated through the AhR. Although all the available data support the concept, the set of data on each particular chemical considered to be dioxin-like is incomplete. One possible limitation of the approach is that it does not consider synergistic or antagonistic interactions among the chemicals. In addition, it does not consider possible action or interactions of these chemicals that are not mediated by the AhR. Indeed, little research has been done on this. For a chemical mixture like PCBs, another limitation of the TEF method is that the risk posed by non-dioxin-like chemicals (that is, noncoplanar PCBs) is not assessed, and some noncoplanar PCBs can act as antagonists (Safe, 1997–1998). Furthermore, the kinetics and metabolism of each dioxin-like chemical differ considerably. Data are often available only on tissue concentrations at any given time and not necessarily on the original exposure of the organism. Sometimes, tissue concentrations are not available. Extrapolation to a meaningful does may add considerable uncertainty to calculation of the TCDD toxicity equivalent (TEQ) to which a person was exposed. In vivo, there also is exposure to dietary flavonoids and other phytochemicals that are AhR antagonists that is not taken into account with the TEQ method (Ashida, et al., 2000; Ciolino et al., 1999; Quadri et al., 2000).

As discussed in *Update 1998* (IOM, 1999), quantitative structure-activity relationship (QSAR) models have been used to estimate the binding affinity of multiple chemical classes. Prediction with these models has been largely unsuccessful because of a focus on minimal energy conformations to predict the activity of molecules. Some QSAR models have been useful across classes of halogenated aromatic compounds.

With the exception of acute and subacute transient peripheral neuropathy, the committee did not specifically consider case studies or other published studies that lacked control or comparison groups. The committee elected to consider case histories when evaluating the association between exposure and those conditions because their transience precluded using case-control and other types of studies with comparison populations.

Report at 22–27 (italics in original). Discussion of various problems such as "publication bias," non-publication of statistically nonsignificant studies, which might affect

any meganalysis, complicates the research described in the report.

IV. *Use of Studies by Veterans Administration*

Based on "statistical associations," the Academy's studies has resulted in the creation of presumptions that certain diseases are attributable to exposure to Agent Orange for purposes of Veteran's compensation. These "associations" are not equivalent to cause in a legal sense for such purposes as mass tort liabilities. These presumption decisions are made by the Secretary for Veterans Affairs. A showing of cause to any degree of probability is not required. The result is summarized in the privately funded National Veterans Legal Services Program, *Self–Help Guide on Agent Orange, Advice for Vietnam Veterans and their Families* (2000 plus supplement), funded, in part, by this court from proceeds from an Agent Orange Settlement Fund created by contributions from manufacturers of Agent Orange. The following table from this guide is useful to veterans (*id.* 5–6):

| Diseases Recognized by VA as Connected to Agent Orange Exposure | Length of Time Requirements: (When symptoms of the disease have to appear and result in a disability at least 10 percent disabling in order to qualify for benefits) |
|---|---|
| **Types of Cancer** | |
| Cancer of the Bronchus | Within 30 years of the last day the veteran served in Vietnam |
| Cancer of the Larynx | Within 30 years of the last day the veteran served in Vietnam |
| Lung Cancer | Within 30 years of the last day the veteran served in Vietnam |
| Prostate Cancer | No time requirement (veteran qualifies no matter when this disease first appears) |
| Cancer of the Trachea | Within 30 years of the last day the veteran served in Vietnam |
| Hodgkins's Disease | No time requirement (veteran qualifies no matter when this disease first appears) |
| Multiple Myeloma | No time requirement (veteran qualifies no matter when this disease first appears) |
| Non–Hodgkin's Lymphoma | No time requirement (veteran qualifies no matter when this disease first appears) |
| **Types of Soft Tissue Sarcoma** | **Time Requirements** |
| Adult Fibrosarcoma<br>Alveolar Soft Part Sarcoma<br>Angiosarcoma<br>Clear Cell Sarcoma of Aponeuroses<br>Clear Cell Sarcoma of Tendons<br>Congenital Fibrosarcoma<br>Dermatofibrosarcoma Protuberans<br>Ectomesenchymoma<br>Epithelioid Malignant Leiomyosarcoma<br>Epithelioid Malignant Schwannoma<br>Epithelioid Sarcoma<br>Extraskeletal Ewing's Sarcoma<br>Hemangiosarcoma<br>Infantile Fibrosarcoma<br>Leiomyosarcoma<br>Liposarcoma<br>Lymphangiosarcoma | No time requirement (veteran qualifies no matter when sarcoma first appears) |

Malignant Fibrous Histiocytoma
Malignant Ganglioneuroma
Malignant Giant Cell Tumor of the Tendon
   Sheath
Malignant Glandular Schwannoma
Malignant Glomus Tumor
Malignant Granular Cell Tumor
Malignant Hemangiopericytoma
Malignant Mesenchymoma
Malignant Schwannoma with Rhabdomyob-
   lastic differentiation
Proliferating (systemic)
Angiendotheliomatosis
Rhabdomyosarcoma
Synovial Sarcoma

| Diseases Other Than Cancer | Time Requirement |
| --- | --- |
| Peripheral Neuropathy (acute or subacute) | Within months of exposure to Agent Orange in Vietnam and cured within 2 years after symptoms first appear |
| Chloracne | Within one year of the last day the veteran served in Vietnam |
| Porphyria Cutanea Tarda | Within one year of the last day the veteran served in Vietnam |
| **Disabilities in Children of Vietnam Veterans** | **Time Requirements** |
| Spina Bifida | Child must have been conceived after veteran first arrived in Vietnam |

## V. Free Scientific Inquiry and Research; Free Access to the Courts

The gist of the plaintiff's purported claims against the Academies is that the reports on Agent Orange are false, inaccurate or incomplete. At an October 28 hearing on the instant case, the court raised the issues of the possible "impact of challenges to free scientific inquiry in the country and the work of scientists and the degree to which scientific inquiry might or would be inhibited by permitting this kind of suit." As noted below, several courts across the country have shared that concern, some specifically with respect to the work of the Academy.

■ The First Amendment protects public debate on matters of public concern, including scientific matters. *See* U.S. Const. amend. I; *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758–59, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (speech of public concern is at the core of the First Amendment's protections). As the Supreme Court has declared, "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The Court has recognized that freedom of expression needs "breathing space" to survive. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 271–72, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It has acknowledged this principle in the areas of academic and scientific debate. *See Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) ("Scholarship cannot flourish in an atmosphere of suspicion and distrust.").

Sound scientific studies are essential to our legal foundations as well as to individual justice. *See* Justice Stephen Breyer, *Introduction, Federal Judicial Center, Reference Manual on Scientific Evidence* (2d ed. 2000) (Reference Manual). As in political controversy, "science is, above all, an adversary process. It is an arena in which ideas do battle...." David Goodstein, "How Science Works," *in* Reference Manual 67, at 74. Our technology and lives depend on modern science. Any unnecessary intervention by the courts in the complex debate and interplay among the scientists that comprises modern science can only distort and confuse. Humility of judges is the *sine qua non* of the law's relation to science. *See, e.g.,* Science, Technology, and Law Panel, Policy and Global Affairs, National Research Council, Access to Research Data in the 21st Century, *passim* (2002); Carnegie Commission on Science, Technology and Government (1992 and following). Scientists should not have to conduct their studies defensively, looking over their shoulders at unnecessary costly litigations.

This court has previously cautioned against the potential chilling effect that litigation can have on scientific inquiry. In *Apicella v. McNeil Labs., Inc.,* 66 F.R.D. 78, 85 (E.D.N.Y.1975), it emphasized that "[f]ree communication in the vital area of health ... should be encouraged." Accordingly, the court denied third-party discovery of the identity of the author of an article concerning deaths allegedly related to administration of an anesthesia drug, concluding that "[t]here is substance to The Medical Letter's contention that if its consultants were forced to participate in searching cross-examinations, often resulting in embarrassment and inconvenience, they would hesitate to act as sources in the future, to the detriment of the medical community and the public." *Id.*

Disclosure would probably unfavorably affect the ability of The Medical Letter to obtain the services of consulting physicians in the future. In addition to the time-consuming problems of depositions and trial appearances, doctors whose names were revealed and linked to situations in which patients had died, or were seriously injured, would themselves be likely targets for malpractice suits. Their reticence to supply information to The Medical Letter might reduce the quantity and quality of medical evaluations of potentially dangerous drugs.

*Id; see also* Catherine Wimberly et al., *Secrecy in Law and Science,* 23 Cardoza L.Rev. 1 (2001). In *Dow Chem. Co. v. Allen,* 672 F.2d 1262, 1275 (7th Cir.1982), the court explained that the protection for academic freedom "extends as readily to the scholar in the laboratory as to the teacher in the classroom." The Court of Appeals affirmed the trial court's refusal to enforce third-party subpoenas seeking the disclosure of university research information. Concerns similar to those raised in *Apicella* and during the October 28 hearing in this case were expressed:

[E]nforcement of the subpoenas would leave the researchers with the knowledge throughout continuation of their studies that the fruits of their labors had been appropriated by and were being scrutinized by a not-unbiased third party whose interests were arguably antithetical to theirs. It is not difficult to imagine that the realization might well be both unnerving and discouraging. Indeed, it is probably fair to say that the character and extent of intervention would be such that, regardless of the purpose, it would "inevitably tend [ ] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor". [citations omitted] ... Clearly, enforcement of the subpoenas carries the

potential for chilling the exercise of First Amendment rights.

*Id.* at 1276.

Similarly, in *Richards of Rockford v. Pac. Gas & Elec. Co.,* 71 F.R.D. 388, 390 (N.D.Cal.1976), the court recognized:

[S]ociety has a profound interest in the research of its scholars, work which has the unique potential to facilitate change through knowledge.... Compelled disclosure of confidential information would without question severely stifle research into questions of public policy, the very subjects in which the public interest is greatest.

*See also Underwager v. Salter,* 22 F.3d 730, 736 (7th Cir.1994) (finding that "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation. More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us."); *Oxycal Labs., Inc. v. Jeffers,* 909 F.Supp. 719, 724 (S.D.Cal.1995) ("The court cannot inquire into the validity of ... scientific theories, nor should it. [The author's] expressions in the Book [regarding how to eliminate the causes of cancer from peoples' lives] could be impermissibly silenced if she had to worry about liability for each statement made in her work."); *Demuth Dev. Corp. v. Merck & Co.,* 432 F.Supp. 990, 993–94 (E.D.N.Y.1977) ("Merck's right to publish free of fear of liability is guaranteed by the First Amendment ... and the overriding societal interest in the untrammeled dissemination of knowledge;" a holding of liability "would serve neither justice nor the public interest because of its manifestly chilling effect upon the right to disseminate knowledge.").

Courts have consistently and repeatedly ruled in favor of protecting the Academy against the chilling effects of unnecessary litigation. In *Alacer Corp. v. National Academy of Sciences,* Case No. 00CC 10533 (Super. Ct. Calif., Orange County), Order dated January 12, 2001, the court granted the Academy's motion to dismiss, pursuant to California's anti-SLAPP statute, a lawsuit challenging the Academy's report entitled *Dietary Reference Intakes for Vitamin C, Vitamin E, Selenium and Carotenoids.* Alacer claimed that report failed to include mineral ascorbates in its discussion of Vitamin C, and sought monetary damages. The court dismissed the complaint because the suit was based on the publication and content of the report, which involved the Academy's exercise of First Amendment rights.

In *Plough Inc. v. National Academy of Sciences,* 530 A.2d 1152 (D.C.App.1987), Plough sought discovery of Academy documents reflecting the confidential internal deliberations of the Academy study committee, including preliminary drafts of study committee reports, and review panel comments. *Id.* at 1154. Plough was sued by a plaintiff who alleged that aspirin made by Plough caused him to develop Reyes Syndrome. The federal Public Health Service (PHS) had conducted a pilot study on the association between aspirin and Reyes Syndrome. PHS contracted with the Academy to review and critique the pilot study, which found that a strong association exists between the use of aspirin and Reyes Syndrome. The Academy issued a series of reports concluding that the pilot study was methodologically sound and that its findings were scientifically valid. Plough issued a third-party subpoena seeking production of Academy documents relating to its review of the study. In denying the discovery, the District of Columbia Court of Appeals specifically noted the potential chilling effect of such discovery, *id.* at 1160, explaining that

"[e]ven limited disclosure of the preliminary conclusions, hypotheses, thoughts and ideas ventured by Committee mem-

bers prior to their being tested and criticized would not only embarrass those members, it would discourage members of [Academy] committees in the future from expressing themselves freely during their deliberations, and might cause some potential volunteers to refrain from participating in [Academy] studies to altogether."

*Id.* at 1157–58.

More recently, in *United States v. Roberts and Veney,* Criminal Nos. F–771–01 and F–3986–00 (Superior Court, District of Columbia, Criminal Division, Felony Branch), February 4, 2003 Order, the court denied a subpoena sought by two criminal defendants charged with felonies who were attempting to obtain discovery from the Academy for use in a hearing on the admissibility of DNA evidence. The discovery sought was information concerning an Academy report entitled *The Evaluation of Forensic DNA Evidence: An Update* ("NRC II"). The *Roberts and Veney* court expressed:

> concern that exposing [the Academy's] deliberative process to discovery could hinder the exchange of ideas. [The Academy's] study committees and review panels subject scientific issues to a robust, searching inquiry, which is furthered by open and frank communication between participants.

February 4, 2003 Order at 2; *see also In re General Nutrition, Inc.,* F.T.C. Docket No. 9175, March 19, 1985 Order Granting Motion to Limit Discovery Subpoena (granting the Academy's motion to limit a subpoena concerning an Academy study of the scientific literature dealing with diet, nutrition and cancer, and noting potential threats to the recruitment of volunteer scientists to carry on the Academy's work: "Were it not for the shielding of its deliberative and review process, participants in the Academy's studies would be inhibited in the candid exchange of views concerning often controversial scientific subjects. Such disclosures would have a chilling effect upon the conduct of vigorous internal debate and seriously impair the Academy's ability to produce reports of the best possible quality for the Government.").

While most of the cases discussed above involved third-party discovery from scientists and scientific institutions, the potential chilling effect would undoubtedly be even greater in a direct suit, such as the case at bar, in which the Academy itself is being sued based on what the plaintiff thinks the Academy failed to include in its Report. What is or is not included in the Report goes to the heart of the protections afforded by the First Amendment.

The Supreme Court has recognized the potential chilling effect of a baseless lawsuit on the exercise of a defendant's First Amendment rights. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340–41, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship.... The First Amendment requires that we protect some falsehood in order to protect speech that matters."); *New York Times Co.,* 376 U.S. at 279, 84 S.Ct. 710 (stating that would-be contributors to the academic debate "may be deterred from voicing their [opinion], even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so"). *See also Barger v. Playboy Enters., Inc.,* 564 F.Supp. 1151, 1156 (N.D.Cal.1983) (requiring plaintiff in defamation suit to make factual allegations of malice in order to avoid potential chilling effect of baseless suit), *aff'd,* 732 F.2d 163 (9th Cir.1984), *cert. denied,* 469 U.S. 853, 105 S.Ct. 175, 83

L.Ed.2d 110 (1984); *Bailey v. Huggins Diagnostic & Rehab. Ctr. Inc.,* 952 P.2d 768, 773 (Colo.Ct.App.1997) ("To subject authors of . . . opinions to the risk of multiple claims for personal injuries . . . based solely upon the majoritarian view that the opinion is 'false,' would impose an intolerable burden upon the author of such opinions. And, the imposition of such a burden would have a ruinous and unjustifiable chilling effect upon free speech."). Accordingly, "[t]o provide 'breathing space' for true speech on matters of public concern, the Court has been willing to insulate even *demonstrably* false speech from liability . . ." *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 778, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (emphasis in original); *Gertz,* 418 U.S. at 339–40, 94 S.Ct. 2997 ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").

## VI. *The Right to Access to the Courts*

To be balanced against the rights of scientists and their organizations is the right of all to seek redress in the courts for wrongs done to them, whether real or imagined. The "constitutional right to access to the courts" must not be denigrated. *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997). *See also, e.g., United Mine Workers of Am. Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Brown v. Stone,* 66 F.Supp.2d 412 (E.D.N.Y.1999) (same). This important right need not be explicated at length now or balanced against the rights of scientists since it is not imperilled by protecting freedom of scientific inquiry in the instant case.

## VII. *Construing Pro Se Claims*

■ Pro se papers are to be construed liberally. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In deciding a Rule 12(b)(6) motion, the court "must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 104, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

The facts alleged in the complaint—unless patently false—must be taken as true and considered in the light most favorable to the plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). "The issue is not whether [the] plaintiff will ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims." *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683.

## VIII. *Analysis of Claims*

The sort of unfounded attack on the scientific community embodied in the instant complaint should not be encouraged. Scientific method, scientific validity, and epidemiology are "matters far afield from the expertise of judges." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 599, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (Rehnquist, C. J., concurring). In this area, the courts "should proceed with great caution in deciding more than we have to, because our reach can so easily exceed our grasp." *Id.*

■ Although the Court's ruling in *Daubert* and cases it spawned concern evidentiary issues, the caution of the Chief Justice is applicable to this case. Plaintiff asks this court to question the opinions of the distinguished scientists of the Acade-

mies. He provides no basis for a belief that the Academies and the scientists who have studied Agent Orange's effects have deliberately or inadvertently adversely affected plaintiff or his family. His assertion that science must support his claim of an Agent Orange relationship to his diseases and that of his children is based on no more than his *ipse dixit.*

Congress designated the Academies—based on their recognized expertise and impartiality—to "evaluate the available scientific evidence" on Agent Orange exposure and Vietnam veterans. Act, § 3(a). Since the enactment of the Act, the Academies—and the many distinguished scientists they have enlisted—have utilized their expertise to review a plethora of scientific evidence on Agent Orange exposure and to make recommendations for future research. *See, e.g.,* Inst. Of Med., *Characterizing Exposure of Vietnam Veterans to Agent Orange and Other Herbicides Used in Vietnam: Interim Findings and Recommendations* (2003); Inst. of Med., *Characterizing Exposure of Vietnam Veterans to Agent Orange and Other Herbicides Used in Vietnam: Final Report* (2003); Inst. of Med., *Veterans and Agent Orange: Update 2000* (2000). Federal courts are not authorized to substitute their judgment for that of the Academies. *See, e.g., Reynolds Metals Co. v. EPA,* 760 F.2d 549, 560 (4th Cir.1985) (noting that the court does not "sit as a scientific body minutely comparing competing research methods and results"); *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 651 (D.C.Cir.1973) (Bazelon, C. J., concurring in result).

There is no plausible contention in the pleadings that the Academies have not adhered to the provisions of the Act in reviewing scientific evidence and offering recommendations for further study. If the Academies have not recommended further study on the ingestion of Agent Orange contaminated meat, the inhalation of fumes from the burning of Agent Orange contaminated plants, or the effect of insects in spreading exposure, as plaintiff claims, they have been authorized to do so based on their estimation of the value and relevance of such study.

There is no showing that there was any venality on the part of the Academies. Plaintiff merely insists that the Academies study what he considers appropriate and come to the conclusions at which he has arrived. Thus, the case does not present difficult issues of epidemiology and causation that might need to be decided in a toxic tort case. *See, e.g.,* Manual, Michael D. Green, D. Mical Freedman and Leon Gordis, *Reference Guide on Epidemiology,* in *Manual* 333 ff.; Jerome P. Kassirer, *Inconsistency in Evidentiary Standards for Medical Testimony,* 288 JAMA 1382 (2002); Alvin R. Feinstein, *Scientific Paradigms and Ethical Problems in Epidemiological Research,* 44 J. Clin. Epidemiol. 119S (1991); Joseph Lau, John PA Ioannidis, Christopher H. Schmidt, *Summing up evidence: one answer is not always enough [in meta-analyis],* 351 Lancet 123 (1998); James M. Robins and Sander Greenland, *Epidemiology, Justice, and the Probability of Causation,* 40 Jurimetrics, 321 (2000); James Robins and Sander Greenland, *The Probability of Causation Under a Stochastic Model for Individual Risk,* 45 Biometrics, 1125 (1989); Proceedings, Brooklyn Law School, Center for Health Law and Policy, Science for Judges, Nov. 7–8, 2003.

Scientific inquiry requires "a common understanding of the centrality of probabilistic reasoning; the importance of testability, interdisciplinarity, and rationality; and an emphasis on the explanatory power of a proposed hypothesis." Erica Beecher–Monas, *The Heuristics of Intellectual Due Process: A Primer for Triers of Sci-*

*ence*, 75 N.Y.U. L.Rev. 1563, 1579 (2000). The Academies have utilized normal scientific inquiry and judgment. Serious science should be given wide leeway in this sensitive work and spared the interference of courts.

Congress has made no provision for judicial review of the Academies' findings or recommendations. Pursuant to the Act, the Academies have produced a wealth of studies on Vietnam veterans and herbicide exposure. A court cannot on these pleadings, however liberally construed, substitute its judgment for that of the Academies' experienced scientists.

Courts are often called upon to determine the evidentiary value of scientific studies. In doing so they cannot assume that all scientists and all studies are reliable. *See* David S. Caudill, *Barely Opening, then Slamming Shut, Science's "Black Box" in Law: A Response to Beecher–Monas' Heuristics*, 23 Cardoza L.Rev. 1795 (2002). Yet, where, as here, there is no warrant to do so in the particular case, they should not attempt to pry open the minds of scientists engaged in serious inquiry.

There has been an enormous literature on the subject of the health of Vietnam veterans and their progeny. *See, e.g.,* Centers for Disease Control Vietnam Experience Study, Health Status of Vietnam Veterans, I. Psychosocial characteristics, 259 JAMA 2701 (1988), II. Physical Health, *Id.* at 2708, III. Reproductive Outcome and Child Health, *Id.* at 2715; Agent Orange Class Assistance Program, The Legacy of Vietnam Veterans and Their Families, Survivors of War: Catalysts for Change, Papers from the 1994 National Symposium (1995).

For the purposes of this memorandum, it is sufficient to rely on the Report to conclude that plaintiff's attack on the Academies and their Agent Orange work is frivolous. Plaintiff has failed to state a claim upon which relief can be granted.

## VIII. *Conclusion*

The motion to dismiss of defendants National Academy of Sciences and Institute of Medicine is granted. No costs or disbursements are granted.

SO ORDERED.